**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| COLLIN L. McGEARY,<br>On behalf of himself and all others similarly<br>situated, | )<br>)<br>)<br>) | |
| Plaintiff, | ) | |
| v. | )<br>) | Civil No. 05-11319-DPW |
| THE GILLETTE COMPANY, | )<br>)<br>) | |
| Defendant. | ) | |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Collin L. McGeary brings this complaint against defendant The Gillette Company on behalf of himself and all other persons similarly situated. Plaintiff and class members seek damages and/or restitution as a result of their purchases of defendant's M3 Power® razor system ("M3 Power") from May 24, 2004 through the present (the "class period"), which system was deceptively marketed and advertised by defendant.

## Parties, Jurisdiction and Venue

1.  Plaintiff Collin L. McGeary is a resident of Leominster, Massachusetts. During the class period, plaintiff purchased the M3 Power for his personal consumption in the eastern district of Massachusetts.

2.  Gillette is a Delaware corporation with its principal place of business in Boston,

Massachusetts. Gillette manufactures consumer products, including the M3 Power. Gillette

1

advertises, distributes and sells its products throughout the United States, including Massachusetts.

3.   The Court has jurisdiction over defendant because defendant maintains its principal place of business in the Commonwealth of Massachusetts and transacts business in the Commonwealth of Massachusetts, including business activities which are the subject of the present complaint. Venue is proper in this district because defendant's principal place of business is located within said district, and business activities which are the subject of this complaint occurred therein.

4.    This Court has subject matter jurisdiction on the basis of P.L. 109-2 (the "Class Action Fairness Act," or "CAFA"), codified at 28 U.S.C. 1332(d), 1453, because: (a) there are at least 100 proposed class members; (b) the citizenship of at least one proposed class member is different from that of defendant; and (c) the matter in controversy exceeds the sum of $5 million, exclusive of interest and costs.

## **Factual Allegations**

5.    The men's razor and blade market in the United States is worth approximately $1.1 billion per year, and defendant holds approximately 90% of the dollar share of that market.

6.   The M3 Power is sold throughout the United States.   It consists of a handle, cartridge, guard bar, lubricating strip, three blades, and a battery-powered feature which causes the razor to oscillate.

6.    Gillette launched the M3 Power in the United States on May 24, 2004.   As of December, 2004, the market share of the M3 Power was 42% of total dollar sales.

7.    In preparation for the launch of the M3 Power, Gillette began airing and publishing advertisements on May 17, 2004.

8.    Gillette's intial advertising for the M3 Power centered on the claim that "micropulses raise hair up and away from skin," thus allowing a consumer to achieve a closer shave.  This "hair-raising" or hair extension claim was advertised in various media, including the internet, television, print media, point of sale materials, and product packaging.  For example, Gillette's website asserted that, in order to combat the problem of "[f]acial hair grow[ing] in different directions," the M3 Power's "[m]icro-pulses raise hair up and away from skin . . ."

9.    At the time of the launch, Gillette's television advertising stated:  "turn on the first micro-power shaving system from Gillette and turn on the amazing new power-glide blades. Micro-pulses raise the hair, so you shave closer in one power stroke."  The advertisement also included a 1.8 second-long animation showing hairs growing.  In the animation, the oscillation produced by the M3 Power is shown as green waves moving over hairs.  In response, the hairs are shown extending in length in the direction of growth and changing angle towards a more vertical position.

10.    On or about January 31, 2005, Gillette began airing revised television commercials for the M3 Power in the United States.  The commercials were revised primarily as a result of litigation instituted in Germany by Schick, defendant's main competitor, which challenged defendant's original claims for the M3 Power.  The commercials were revised so that the hairs in the animation no longer changed angle, and some of the hairs are shown to remain static.  In addition, the voice-over was changed to say: "Turn it on and micropulses raise the hair so the blades can shave closer."  The revised animation nonetheless depicted many hairs extending, in many instances multiple times the original length.

11.    The depiction in the revised commercial of how much the hair lengthens is not consistent

with Gillette's own studies regarding the effect of micropulses on hair.  *See, generally*, *Schick Manufacturing, Inc., et al. v. The Gillette Company,* No. 3-05-CV-174-JCH (D.Conn. May 31, 2005) (attached as Exhibit A).

12.    The M3 Power's oscillations do not cause hair to change angle on the face.

13.    Gillette's original advertisements depicting such an angle change are both unsubstantiated and inaccurate and were falsely and deceptively conveyed to consumers.

14.    The animated portion of Gillette's television advertisement is not physiologically accurate because the hairs and skin do not appear as they would at such a level of magnification and the hair extension effect is greatly exaggerated.

15.    The animation exaggerates the effect that the razor's vibration has on hair and conflicts with Gillette's own testing.  *See* Exhibit A.

16.    Gillette's claims with respect to changes in angle and the animated portion of Gillette's current advertisement are literally false.  *See*  Exhibit A, p. 22.

17.    On or about April 15, 2005, plaintiff purchased a M3 Power razor system for his own use. After trying it, he had doubts as to whether it was performing as promised.  For comparison, he then shaved with a non-oscillating multi-blade razor, and concluded there was no difference in the shaving experience or results.  He thus ceased using the M3.

18.    On May 31, 2005, the U.S. District Court in Connecticut issued a preliminary injunction which enjoins Gillette from:

> stating or communicating, directly or indirectly, by words or visual images, in any advertising packaging, promotional materials or promotional activities that: (1) the M3 Power razor or its micro-pulses or oscillations change the angle of hair in relation to the skin; or (2) the M3 Power razor or its

> micro-pulses or oscillations extend or lengthen hair
> by a magnitude or with a frequency that is not
> literally or physiologically accurate.

*See Schick Manufacturing, Inc., et al. vs. The Gillette Company,* No. 3-05-CV-174-JCH,

(D.Conn. May 31, 2005)(attached as Exhibit B).

19.     The District Court further ordered that Gillette must, within 30 days of May 31, 2005:

> (1) remove or cover by sticker on all packaging for
> the M3 Power razor any words or visual images that
> state or otherwise communicate that the M3 Power
> razor or its micro-pulses or oscillations:
>> (a) change the angle of hair in
>> relation to the skin; or
>> (b) extend or lengthen hair by a
>> magnitude or with a frequency that is
>> not literally or physiologically
>> accurate; and
> (2) remove all displays, including in-store displays,
> that state or otherwise communicate that the M3
> Power razor or its micro-pulse of oscillations:
>> (a) change the angle of hair in
>> relation to the skin; or
>> (b) extend or lengthen hair by a
>> magnitude or with a frequency that is
>> not literally or physiologically
>> accurate.

*Id.*

20.     As of June 15, 2005, Gillette continued to advertise on its website that the M3 Power's

motor "sends micro-pulses to the blades.  Micro-pulses raise hair up and away from skin so you

can shave closer and more thoroughly in one easy power stroke."

21.     Gillette's false and deceptive claims regarding the M3 Power's hair raising ability as well

as the M3 Power's effect on changing the angle of hair are central to Gillette's marketing of the

M3 Power and are material facts that ordinary consumers rely on when deciding to purchase the

product.

22.    As alleged herein, Gillette - through a standardized advertising, promotional and marketing campaign which was hatched, incubated, facilitated and consummated by Gillette in a uniform manner from within the Commonwealth of Massachusetts - has engaged in unfair, deceptive, wrongful, and unlawful practices by purposefully misrepresenting the performance of the M3 Power. Gillette's misrepresentations are belied by its own clinical studies and by competitor studies. *See* Exhibit A.

23.    Defendant's false claims as to the M3 Power's capabilities distinguished it from other shaving systems on the market and caused consumers to purchase it rather than less expensive shaving systems.   In fact, the battery feature of the M3 Power offers no material benefits to consumers, and costs significantly more than equally effective, but less expensive, shaving systems.   Additionally, on information and belief, the razor blades that Gillette advertises and markets for use with the M3 Power razor are interchangeable with other less expensive Gillette razor blades. Thus, Plaintiffs and members of the putative class have suffered economic damages as a result of the complained-of conduct.

24.    As a result of this improper and unlawful conduct, Gillette has sold millions of dollars in M3 Power razors and cartridges which it would not have otherwise sold had it represented the product accurately, and it has therefore been unjustly enriched at the expense of plaintiff and the class members.

## Class Allegations

25.    Plaintiff brings this case individually and on behalf of a class defined as:  All individuals who purchased Gillette's M3 Power razor and cartridges for use and not resale in the United

States from May 24, 2004 through the present.  Excluded from this class are current and former employees, officers, and directors of Gillette, the presiding judge in this matter and any jurors who are called upon to hear this matter.

26.  This action is proper for class treatment under Fed.R.Civ.P. 23.  The proposed class is so numerous that individual joinder of all members is impracticable.  While the exact number and identities of the class members are unknown to plaintiff at this time, plaintiff is informed and believes that the class numbers in the thousands, and likely tens of thousands.

27.  Common questions of law and fact arise from Gillette's conduct in misrepresenting the performance capabilities of the M3 Power, and said common questions predominate over any questions affecting only individual class members.   The myriad questions of law and fact common to the class include:

(a)  whether Gillette's M3 Power razor or its micro-pulses/oscillations change the angle of hair in relation to the skin;

(b)  whether Gillette's M3 Power razor or its micro-pulses/oscillations extend or lengthen hair by a magnitude or with a frequency as represented by Defendant;

(c)  whether Gillette failed to disclose to consumers that its own testing revealed that the capabilities of the M3 Power were not as represented;

(d)  whether Gillette engaged in marketing practices intended to deceive consumers;

(e)  whether Gillette engaged in marketing practices which were false and/or deceptive to consumers;

(f)  whether Gillette, through its misconduct, has been unjustly enriched at the expense of plaintiff and the class members;

(g) whether Plaintiff and the Class are entitled to damages and/or restitution from Gillette.

28.     Plaintiff will fairly and adequately represent and pursue the interests of class members.  . Plaintiff understands the nature of his claims herein, has no disqualifying conditions, and will vigorously represent the interests of the Class.  Plaintiff has selected counsel with substantial experience in consumer class action cases, including cases similar to the present action. Furthermore, plaintiff's claims are typical of those of class members in that they are based upon defendant's standardized and uniform misleading, unfair, deceptive and/or false representations and/or concealment, as more fully described herein.

29.     A class action is superior to other methods for the fair and efficient adjudication of this controversy, and there are no unusual or extraordinary factors which would render it unmanageable.

30.     Plaintiff and class members have been substantially damaged by, and Gillette has substantially profited from, defendant's unlawful conduct.

## COUNT I- UNJUST ENRICHMENT

31.     The allegations of paragraphs 1 – 29 are incorporated herein as if fully set forth.

32.     Gillette received certain monies as a result of its uniform improper and unlawful marketing of M3 Power products, which monies are excessive, unreasonable, unfair, and unwarranted.

33.     Plaintiff and class members have conferred a benefit on Gillette in the form of paying a higher purchase price for the products as misrepresented by Gillette, and Gillette has knowledge of this benefit and has voluntarily accepted and retained the benefits conferred on it.

34.     Gillette will be unjustly enriched if it is allowed to retain such funds, and the class is

entitled to restitution of the amount by which Gillette has been unjustly enriched as a result of their purchases.

WHEREFORE, plaintiff, on behalf of himself and the class, prays that this Court:

a.  enter an order certifying the class, and appointing plaintiff as the class representative and plaintiff's lawyers as class counsel;

b.  enter judgment awarding restitution to plaintiff and class members in the amount by which defendant has been unjustly enriched, plus interest thereon;

c.  enter judgment awarding to plaintiff and the class the costs of this action and reasonable attorneys' fees; and

d.  grant such other and further relief as the Court deems just and proper.

### COUNT II – UNFAIR/DECEPTIVE TRADE PRACTICES

35.  The allegations of paragraphs 1 – 34, above, are incorporated herein as if fully set forth.

36.  At all times relevant to this complaint, Gillette was engaged in trade or commerce. within the meaning of section 2(a) of the Massachusetts Consumer Protection Act, G.L. c. 93A, which provides:  "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

37.  At all times relevant to this complaint the following regulations, promulgated by the Attorney General pursuant to G.L. c. 93A, section 2(c), were in full force and effect:

940 CMR 6.04 (1): Misleading Representations.  It is an unfair or deceptive act for a seller to make any material representation of fact in an advertisement if the seller knows or should know that the material representation is false or misleading or has the tendency or capacity to be misleading . . .

940 CMR 6.04(2):  Disclosure of Material Representations.  It is an unfair or deceptive act for a seller to fail to clearly and conspicuously

disclosure in any advertisement any material representation, the omission of which would have the tendency or capacity to mislead reasonable buyers or prospective buyers.

38.    Purchasers of M3 Power products, including plaintiff, are consumers within the meaning of the Act.

39.    Defendant's false, deceptive, and misleading acts and omissions with respect to the advertising and marketing of its M3 Power products, as more specifically set forth herein, violated the Code of Massachusetts Regulations and were unfair and deceptive in violation of G.L. c. 93A, section 2.

40.    Defendant knew that its advertisements and marketing scheme were deceptive, misleading, and unfair and intended for customers to be deceived and harmed thereby.

41.    Defendant's violations of G.L. c. 93A, section 2, were willful and knowing.

42.    On June 23, 2005, plaintiff – through counsel – forwarded a demand for relief to defendant pursuant to G.L. c. 93A, section 9, which demand described the unfair and deceptive practices complained of and the terms of a proposed resolution of plaintiff's claims. Said demand for relief was sent via certified mail, return receipt requested, and was duly received by defendant.

43.    In a letter dated July 8, 2005, defendant responded to Plaintiff's demand for relief.

44.    Defendant's response to plaintiff's demand for relief did not constitute a reasonable tender of settlement as defined by G.L. c. 93A, section 9.

45.    Defendant's failure to grant reasonable relief upon Plaintiff's demand was in bad faith with knowledge or reason to know that its conduct violated G.L. c. 93A, section 2, and caused harm to

plaintiff and class members as asserted herein.

WHEREFORE, plaintiff, on behalf of himself and the class, prays that this Court:

a. enter an order certifying the class, and appointing plaintiff as class representative and plaintiff's lawyers as class counsel;

b. enter judgment awarding actual damages to plaintiff and class members or statutory damages of twenty-five dollars ($25.00) per violation of G.L. c. 93A, section 2, whichever is greater, plus interest thereon;

c. enter judgment doubling or trebling the damages awarded;

d. enter judgment awarding to plaintiff and the class the costs of this action and reasonable attorney's fees; and

e. grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff claims trial by jury.

Respectfully submitted,
Plaintiff, by his attorneys:


/s/Kenneth D. Quat
BBO# 408640
Law Office of Kenneth D. Quat
9 Damonmill Square, Suite 4A-4
Concord MA 01742
978-369-0848
ken@quatlaw.com

11

OF COUNSEL:

Lance A. Harke
HARKE & CLASBY LLP
155 South Miami Ave., Suite 600
Miami, Florida 33130
 (305) 536-8220

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SCHICK MANUFACTURING, INC.,    :
ET AL                          :
      Plaintiffs            :
                               :    CIVIL ACTION NO.
v.                             :    3-05-cv-174 (JCH)
                               :
THE GILLETTE COMPANY           :    MAY 31, 2005
      Defendant             :

**RULING RE: MOTION FOR PRELIMINARY INJUNCTION [DKT. NO. 7],
MOTION FOR LEAVE TO AMEND [DKT. NO. 103], and
VARIOUS MOTIONS IN LIMINE [DKT. NOS. 104, 105, and 111]**

The plaintiff, Schick Manufacturing Company ("Schick"), seeks a preliminary injunction enjoining the defendant, The Gillette Company ("Gillette"), from making certain claims about its M3 Power razor system ("M3 Power"). Schick contends that Gillette has made various false claims in violation of section 43(a) of the Lanham Act, 15 U.S.C. §1125(a) and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, et seq.

As a preliminary matter, Schick has filed a Motion for Leave to File and Amended Complaint [Dkt. No. 103]. Leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). The Second Circuit has held that "'considerations of undue delay, bad faith, and prejudice to the opposing party [are] touchstones of a district court's discretionary authority to deny leave to amend.'" Krumme v. WestPoint Stevens Inc., 143 F.3d 71, 88 (2nd Cir. 1998) (quoting Barrows v. Forest Laboratories, 742 F.2d 54, 58 (2d Cir. 1984)). Having considered these factors, as well as the scope of Schick's proposed amendments, the court concludes that leave to amend is appropriate.

The court must also address three pending motions in limine.  With regard to Plaintiff's Exhibits Nos. 111, 112, 131, the objections of Gillette are overruled.  PX 131 is received for the limited purpose offered, to establish the date the Dutch action was filed.  With regard to Schick's Motion in Limine to Exclude Untimely Expert Testimony [Dkt. No. 104], the Motion is denied, except with regard to the alternative relief sought.  DX 124(d) and (e) are for identification only.  They were received on that basis.  The Motion is denied to the extent it seeks to strike them as demonstrative evidence.  The Motion is also denied to the extent it seeks to strike Dr. Salinger's testimony.  However, the court grants Schick's alternative request to file a supplemental Affidavit of Dr. Thornton, which the court has now reviewed.  Finally, the Motion to exclude DX 133 and DX 134, Declarations of Dr. Grupen and Dr. Clarke, is denied.  With regard to Schick's Motion in Limine to Exclude Third Declaration of Dr. Philpott, it is denied.

The standard regarding the grant of a prohibitory preliminary injunction in the Second Circuit is clear.[1]  "To obtain a preliminary injunction the moving party must show, first, irreparable injury, and, second, either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor."  Green Party of N.Y. State v. N.Y. State Bd. of Elections, 389 F.3d 411, 418 (2d Cir. 2004).  If Schick proves that irreparable injury may result, the court will then consider the merits of Schick's claim.

The Lanham Act creates a cause of action against any person who,

---

[1]Gillette suggests the relief sought is a mandatory injunction; this court does not agree. Schick seeks to prohibit allegedly false advertising, not to mandate action by Gillette.  See Phillip v. Fairfield University, 118 F.3d 131 (2d Cir. 1997) (an injunction is mandatory where "its terms would alter, rather than preserve, the status quo by commanding some positive act").

> in connection with any goods or services, or any container for goods, uses
> in commerce any word, term, name, symbol, or device, or any
> combination thereof, or any false designation of origin, false or misleading
> description of fact, or false or misleading representation of fact, which . . .
> (B) in commercial advertising or promotion, misrepresents the nature,
> characteristics, qualities, or geographic origin of his or her or another
> person's goods, services, or commercial activities

by "any person who believe he or she is or is likely to be damaged by such act."  15

U.S.C. § 1125(a).

In order to succeed on its false advertising claim, Schick must prove five

elements of this claim.  Omega Engineering, Inc. v. Eastman Kodak Co., 30 F.Supp.2d

226, 255 (D.Conn. 1998) (citing various treatises and cases).  These are the following:

(1)  The defendant has made a false or misleading statement of fact.  The

statement must be (a) literally false as a factual matter or (b) likely to deceive or

confuse.  S.C. Johnson & Son, Inc. v. Clorox Company, 241 F.3d 232, 238 (2d

Cir. 2001).

(2)  The statement must result in actual deception or capacity for deception

"Where the advertising claim is shown to be literally false, the court may enjoin

the use of the claim without reference to the advertisement's impact on the

buying public."  Id. (internal quotations omitted).

(3)  The deception must be material.  "[I]n addition to proving falsity, the plaintiff

must also show that the defendants misrepresented an inherent quality or

characteristic of the product."  Id. (internal quotations omitted).

(4)  Schick must demonstrate that it has been injured because of potential

decline in sales.  Where parties are head-to-head competitors, the fact that the

defendant's advertising is misleading presumptively injures the plaintiff.  Coca-

Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 317 (2d Cir. 1982)

(abrogated on other grounds by statute as noted in Johnson & Johnson v. GAC

Int'l, Inc., 862 F.2d 975, 979 (2d Cir.1988)).

(5)  The advertised goods must travel in interstate commerce.

**FACTS**

The court held a scheduling conference on the preliminary injunction motion on

March 2, 2005.  The court allowed the parties to conduct limited discovery prior to

conducting a hearing on Schick's motion for a preliminary injunction.  The hearing on

the motion was conducted over four days: April 12, 13, 22, and May 2, 2005.  During

the hearing, Schick called five witnesses: Adel Mekhail, Schick's Director of Marketing;

Peter M. Clay, Gillette's Vice-President for Premium Systems; Dr. David J. Leffell,

Professor of Dermatology; Christopher Kohler, Schick Research Technician; and John

Thornton, statistical consultant. Gillette also called five witnesses during the hearing:

Dr. Kevin L. Powell, Gillette's Director of the Advanced Technology Centre; Dr. Michael

A. Salinger, Professor of Economics; Peter M. Clay, Gillette's Vice-President for

Premium Systems; Dr. Ian Saker, Gillette Group Leader at the Advanced Technology

Centre and Dr. Michael P. Philpott, Professor of Cutaneous Biology.

The men's systems razor and blade market is worth about $1.1 billion per year in

the United States.  Gillette holds about 90% of the dollar share of that market, while

Schick holds about 10%.  The parties are engaged in head-to-head competition and the

court credits testimony that growth in the razor systems market results not from volume

increases but "with the introduction of high price, new premium items."  Hr'g Tr. 39:20-

21.

4

Schick launched its Quattro razor system in September of 2003 and expended many millions of dollars in marketing the product.  Although Schick had projected $100 million in annual sales for the Quattro, its actual sales fell short by approximately $20 million.  From May 2004 to December 2004, Quattro's market share fell from 21% of dollar sales to 13.9% of dollar sales.

Gillette launched the M3 Power in the United States on May 24, 2004.  In preparation for that launch, it began advertising that product on May 17, 2004.  The M3 Power is sold throughout the United States.  The M3 Power includes a number of components including a handle, a cartridge, guard bar, a lubricating strip, three blades, and a battery-powered feature which causes the razor to oscillate.  The market share of the M3 Power, launched in May 2004, was 42% of total dollar sales in December 2004.

Gillette's original advertising for the M3 Power centered on the claim that "micro-pulses raise hair up and away from skin," thus allowing a consumer to achieve a closer shave.  This "hair-raising" or hair extension claim was advertised in various media, including the internet, television, print media, point of sale materials, and product packaging.  For example, Gillette's website asserted that, in order to combat the problem of "[f]acial hair grow[ing] in different directions," the M3 Power's "[m]icro-pulses raise hair up and away from skin . . ."  PX 2, Hr'g Tr. 33:25-34:22.  Of Gillette's expenditures on advertising, 85% is spent on television advertising.  At the time of the launch, the television advertising stated, "turn on the first micro-power shaving system from Gillette and turn on the amazing new power-glide blades.  Micro-pulses raise the hair, so you shave closer in one power stroke."  PX 14.2(C).  The advertisement also included a 1.8 second-long animated dramatization of hairs growing.  In the animated

5

cartoon, the oscillation produced by the M3 Power is shown as green waves moving over hairs. In response, the hairs shown extended in length in the direction of growth and changed angle towards a more vertical position.

The court notes that eight months passed between the launch of the M3 Power and the date Schick initiated the instant suit. Schick maintains that there are two factors that excuse this delay. First, Schick invested time in developing a stroke machine and test protocol that would allow it to test the M3 Power with some degree of confidence and effectiveness.[2] Specifically, the development of a machine that would deliver a stroke of consistent pressure to a test subject's face took time. Second, after completing its first tests of Gillette's claims that the M3 Power raises hair in October, Schick chose to pursue its claims in Germany. In November of 2004, Schick sued Gillette in Germany to enjoin it from making claims that the M3 Power raised hairs. In late December of 2004, the Hamburg Regional Court affirmed the lower court's order enjoining Gillette from making such claims in Germany.

While the court finds that it may have been possible to develop testing protocols in a quicker fashion, the court finds the M3 Power was a new product with a feature (the use of battery power) that had never before been present in wet shavers. The court finds the time Schick took to develop testing of and to test the M3 Power is excusable. The court has been presented with no evidence of bad faith or strategic maneuvering behind the timing of the instant lawsuit.

In late January of 2005, Gillette revised its television commercials for the M3

----

[2]The court also notes that time spent by Schick testing Gillette's "angle-change" claim, which claim Gillette abandoned in January of 2005.

Power in the United States.  It chose to do so based on both the German litigation as well as conversations between the parties about Schick's discomfort with certain claims made in the advertising.  The animated product demonstration in the television commercials was revised so that the hairs in the demonstration no longer changed angle, and some of the hairs are shown to remain static.  The voice-over was changed to say, "Turn it on and micropulses raise the hair so the blades can shave closer."  PX 14.10C.  The product demonstration in the revised advertisements depicts the oscillations to lengthen many hairs significantly.  The depiction in the revised advertisements of how much the hair lengthens--the magnitude of the extension--is not consistent with Gillette's own studies regarding the effect of micropulses on hair.  The animated product demonstration depicts many hairs extending, in many instances, multiple times the original length.  Gillette began broadcasting the revised television commercials on or about January 31, 2005.  Schick provided credible evidence, however, that the prior version of the advertisement is still featured on the Internet and on product packaging.

Television advertisements aim to provide consumers a "reason to believe," that is, the reason consumers should buy the advertised product.  Because of the expense of television advertising, companies have a very short period of time in which to create a "reason to believe" and are generally forced to pitch only the key qualities and characteristics of the product advertised.

Gillette conceded during the hearing that the M3 Power's oscillations do not cause hair to change angle on the face.  Its original advertisements depicting such an angle change are both unsubstantiated and inaccurate.  Gillette also concedes that the

7

animated portion of its television advertisement is not physiologically exact insofar as the hairs and skin do not appear as they would at such a level of magnification and the hair extension effect is "somewhat exaggerated."  Gillette Co.'s Prop. Findings of Fact [Dkt. No. 114] ¶ 33.  The court finds that the hair "extension" in the commercial is greatly exaggerated.  Gillette does contend, however, that the M3 Power's oscillations cause beard hairs to be raised out of the skin.  Gillette contends that the animated product demonstration showing hair extension in its revised commercials is predicated on its testing showing that oscillations cause "trapped" facial hairs to lengthen from the follicle so that more of these hairs' length is exposed.  Gillette propounds two alternative physiological bases for its "hair extension" theory.  First, Gillette hypothesizes that a facial hair becomes "bound" within the follicle due to an accumulation of sebum and corneocytes (dead skin cells).  Gillette contends that the oscillations could free such a "bound" hair.  Second, Gillette hypothesizes that hairs may deviate from their normal paths in the follicle and become "trapped" outside the path until vibrations from the M3 Power restore them to their proper path.

Schick's expert witness, Dr. David Leffell, Professor of Dermatology and Chief of Dermatologic Surgery at the Yale School of Medicine, testified that, based on his clinical and dermatological expertise, he is aware of no scientific basis for the claim that the oscillations of the M3 Power would result in hair extension, as Gillette contends.  Dr. Leffell stated that Gillette's "hair extension" theory is inconsistent with his 20 years of experience in dermatology.  He testified that he has never seen a hair trapped in a sub-clinical manner, as hypothesized by Gillette.  Dr. Leffell testified that, in certain circumstances, trapped hairs will result in clinical symptoms, such as infection or

8

inflammation.  With respect to Gillette's hypothesis that the interaction between sebum and corneocytes trap hairs, however, Dr. Leffell stated, and the court credits, that in non-clinical circumstances, sebum and corneocytes do not accumulate sufficiently to inhibit hair growth.  Moreover, everyday activities such as washing or shaving remove accumulations of sebum and corneocytes.

Gillette's expert hair biologist, Dr. Michael Philpott, has studied hair biology for almost twenty years.  He testified that, prior to his retention as an expert by Gillette, he had never seen a hair trapped in the manner posited by Gillette.  Only after being retained by Gillette did Dr. Philpott first claim to have encountered this hair extension theory.  Dr. Philpott acknowledged that neither of Gillette's two hypothesis of hair extension have any support in medical or scientific literature.  With regard to Gillette's theory that hair could become bound in the follicle by sebum and corneocytes, Dr. Philpott admitted that no evidence supports that theory.  Dr. Leffell testified that erector pili muscles, which cause hairs to stand up in response to various stimuli, as is commonly seen in the case of goosebumps, may also provide a biologicial mechanism for hair extension.  Neither Dr. Leffell nor Dr. Philpott, however, testified on the relationship between the application of mechanical energy and the erector pili muscles, and neither party has contended that these muscles play a role in Gillette's hair extension theory.

In addition to positing biological mechanisms that might support the claim that the M3 Power's oscillations raise hairs, Gillette introduced evidence of experiments and testing to support those claims.  Gillette provided summaries of said testing which were not prepared contemporaneously with the testing, conducted in the early 1990's, they

9

purport to memorialize.  Instead, they were prepared in anticipation of litigation in late 2004.

Gillette performed experiments using oscillating razors in 1990, 1991 and 2003. In 1990 and 1991, Gillette performed studies using prototype oscillating razor handles fitted with razor systems other than the M3 Power, the Atra Plus and Sensor razor cartridge, two other Gillette products.  In each of these initial experiments, a circle was drawn on a test subject's face.  Twenty beard hairs within the circled region were measured with an imaging stereomicroscope manufactured by the Leica Company. That instrument measures hairs three-dimensionally to a resolution of three to four microns.  The test subject then stroked the area using an oscillating razor with blunted blades.  Then, twenty beard hairs within the circled region were again measured with a stereomicroscope.  The same protocol was followed using a non-oscillating razor with blunted blades, and the changes in hair measurement were compared.

The Atra Plus study was performed in 1990 and included 10 test subjects.  The study results show that the panelists' average hair length increased by 83.3 microns after five strokes with the oscillating razor versus 6.3 microns with the non-oscillating razor.  The Sensor study was performed from 1990 to 1991 and also involved 10 test subjects.  The subjects' mean hair length increased by 27.9 microns versus 12.9 microns with the non-oscillating razor.  While both tests provided some evidence of a hair extension effect and the magnitude of that effect, neither test indicated what percentage of hairs were lengthened.

Notably, while Gillette found that use of both the oscillating Atra Plus and Sensor razors resulted in an increase in beard hair length, there was significant difference

between the average increase caused by the Atra Plus and that caused by the Sensor.

Furthermore, no evidence was presented to the court regarding similarities or

differences between the M3 Power razor and the Atra Plus or Sensor.  The sample

size, ten test subjects per study, was small.  The twenty beard hairs measured prior to

stroking were not necessarily the same hairs measured after stroking.  The test

included no efforts to keep constant the variables of pressure on the razor or speed of

the shaving stroke.  In addition, Gillette's chief scientist, Kevin Powell, testified that the

pressure or load applied by consumers co-varies to a statistically significant degree with

whether a razor oscillates.  All these deficiencies cause this court not to credit the

studies' finding that oscillations cause hair lengthening.[3]

In 2003, Gillette performed a study using a prototype of the M3 Power.  In the fall

of 2003, Gillette tested a Mach 3 cartridge fitted with an oscillating handle.  That

prototype was called the "Swan."  The Swan prototype's motor, handle, and cartridge

differ from those features of the actually-marketed M3 Power.  Four test subjects were

used.[4]  The test protocol was identical to that used in 1990 and 1991 except that,

instead of using blunted blades, Gillette removed the blades from the razor.  The study

results suggest that the oscillating-Swan-prototype produced an average increase in

hair length of between 32 and 40 microns while the non-oscillating prototype yielded no

---

[3]In Gillette's testing, no effort was made to control for variables, such as pressure on, or speed of, the razor.  Failure to control for variable makes Gillette's "results" unscientific and not supportive of any conclusion.

[4]The sample size of four was chosen because the 2003 study, according to Gillette, was merely "confirmatory."  Because the court finds the earlier tests deficient, the 2003 study cannot be "confirmatory."

11

average increase.  That 32 to 40 micron increase represented an average of eight to

ten percent increase in hair length.  The test does not indicate what percentage of hairs

experience any lengthening as a result of oscillations.  The court does not credit Dr.

Powell's opinion that the differences between the model used in the test and the

marketed product has no impact on the testing.  Failure to use the marketed product is

critical.  The court cites the varied results Gillette reports between the Atra Plus,

Sensor, and "Swan" tests as only one reason to conclude that failure to use the market

product undercuts the 2003 testing.  Further, the test protocol and sample size cause

the court to question the validity of these study findings.

In addition to testing oscillating battery-powered razors, Gillette conducted what

has been called the Microwatcher study.  The Microwatcher is a commercially available

product consisting of a miniature camera with an illumination system that channels light

into an orifice at the tip of a transparent hemispherical dome.  The device allows the

user to impart mechanical energy into the top and underlying layers of the skin, which,

according to Gillette, replicates the mechanical energy imparted by the oscillating

razor.[5]  The recorded video images introduced into evidence show individual hairs

releasing from just below the skin surface.  Gillette did not introduce evidence to

describe what the various elements of the photo were.  When asked by the court to

identify the various elements appearing in the video were, Dr. Philpott could not identify

---

[5]Despite conducting the study on eighteen subjects, Gillette submitted only three short
video clips and does not indicate that they are representative of the study results.  Further,
there is no indication of the length of the manipulation, the amount of pressure applied, or
shave preparation.  Without more information, the study cannot support the conclusion that the
M3 Power extends hair.

or explain important skin features.  For example, the court pointed to an area surrounding the individual hair, of darker hue than the rest of the skin, on the video, but Dr. Philpott could not explain what that area was or what might explain its coloration. The court further finds that Gillette provides no evidence to suggest the relationship between the amount of mechanical energy imparted by the Microwatcher and that imparted by the M3 Power.

Schick performed its own study which it contends proves the falsity of Gillette's advertising with respect to claims regarding hair extension.[6]  Schick's study took place over three days and included 37 test subjects.  With respect to each test subject, twenty hairs were measured before and after strokes with an M3 Power razor with blunted blades in both the power-on and power-off modes.  The strokes were taken using an automated shaving device developed specially by Schick for the purposes of testing the M3 Power razor and Gillette's claims with respect to it.  Images of the hairs were taken before and after the razor strokes using a camera with a plate that flattened hair onto the face.  The images were then downloaded to a computer and hair lengths were assessed using ImagePro software.  An independent statistician evaluated the data for all three days.  Schick argues that its data indicates that there was no statistically significant difference between the change in hair length with power off and the change in hair length with power on.

Again, however, the court finds the test protocol lacking and results questionable.  Schick's testing shows that some hairs shrunk even in the absence of

---

[6]Schick first performed tests to determine whether the M3 Power changes the angle of beard hairs.

13

the use of water, which Gillette's testing has found to result in hair shrinkage.  Schick's

expert testified that this may have been the result of measurement error, and the court

agrees.[7]  Furthermore, Gillette provided expert testimony that the glass plate used to

flatten hairs so that they could be measured would likely result in distortion, making it

difficult to accurately measure hair lengths.  Such flaws in Schick's testing cause the

court to be skeptical of Schick's test results and the suggestion that these results

demonstrate that the M3 Power does not cause hairs to extend.

The flaws in testing conducted by both parties prevent the court from concluding

whether, as a matter of fact, the M3 Power raises beard hairs.

## II.    ANALYSIS

### A.    Irreparable Harm

Schick argues that the M3 Power advertising is causing it irreparable harm.

Sales of its premiere razor, the Quattro, have decreased precipitously since Gillette's

release of the M3 Power.  It is far from clear that all of the decline in Quattro sales is

attributable to the allegedly false statements made in the course of M3 Power

advertising.  It is this difficulty, however, in determining what portion of the decline is so

attributable that makes Schick's harm irreparable.  "It is virtually impossible to prove

that so much of one's sales will be lost or that one's goodwill will be damaged as a

direct result of a competitor's advertisement. Too many market variables enter into the

advertising-sales equation. Because of these impediments, a Lanham Act plaintiff who

can prove actual lost sales may obtain an injunction even if most of his sales decline is

---

[7]It may also result from the application of a glass plate meant to flatten the hairs so that
they could be measured in two dimensions.

attributable to factors other than a competitor's false advertising." <u>Coca-Cola Co. v. Tropicana Products, Inc.</u>, 690 F.2d 312, 316 (2d Cir. 1982).

Gillette argues that Schick's delay in seeking relief, as a factual matter, militates against a finding of irreparable harm.  "Delay is typically relevant to both irreparable harm and to laches, although the latter doctrine relates only to permanent relief." <u>Tom Doherty, Inc. v. Saban Entertainment, Inc.</u>, 60 F.3d 27, 39 (2d Cir. 1995) (considering delay in seeking preliminary injunction in the context of a contract dispute).  Depending on the facts of a particular case, delay may be relevant for other purposes as well.  <u>Id</u>. In a trademark case, where a "high probability of confusion" normally gives rise to a presumption of irreparable harm for the purposes of obtaining a preliminary injunction, that presumption is "inoperative if the plaintiff has delayed either bringing suit or in moving for preliminary injunctive relief."  <u>Tough Traveler, Ltd. v. Outbound Products</u>, 60 F.3d 964, 967-68 (2d Cir. 1995).  It is important to remember, however, that a finding of irreparable harm may still be made on the basis of other relevant factors; the inexcusable delay affects only the <u>presumption</u> of irreparable harm.  <u>Id</u>. at 969.  In the instant context, the court considers delay as one of several factors to be considered in determining whether Schick has established irreparable harm.

There is no presumption of irreparable harm in this case as such a presumption arises in the false advertising context only when the challenged advertising mentions a competitor by name.  <u>Castrol, Inc. v. Quaker State Corp.</u>, 977 F.2d 57, 62 (2d Cir. 1992).  Furthermore, in the instant case, the reasons for Schick's delay ought to guide the court's consideration of whether that delay is probative with respect to the question of irreparable harm.  In the trademark context, a delay is excused where "the plaintiff

15

does not know how severe the [trademark] infringement is" or where it is caused by a plaintiff's "good faith efforts to investigate an infringement." Id. A delay is inexcusable where a party was aware of the action it now wishes to enjoin, but the delay evidences that the party determined that the action did not violate its rights. Tom Doherty, Inc., 60 F.3d at 39.

Schick provides two excuses for the time lag between the initial airing of the allegedly-false Gillette advertising. The first is that it needed time to subject the claims made in the contested advertising to scientific testing. While the advertising began to air publicly in late May 2004, Schick did not complete its testing until October 2004. While the testing could have proceeded more quickly, see supra at 5, there are reasons the testing took five months and that period, to the extent that it is deemed "delay," is excused. Schick was engaged in a good faith investigation of its competitor's claims.

The second excuse for delay involves the three month period after Schick's initial testing had been completed. Schick claims that the expense of pursuing litigation in a United States forum led it to test Gillette's claims in other fora in November 2004, before initiating the instant lawsuit. Therefore, upon completing its testing, it initiated lawsuits abroad, prior to initiating the instant suit in late January 2005. Schick argues that its attempts to resolve the issue in alternative fora excuse its delay. The cases it cites, however, either address delay in the context of patent litigation, Whistler Corp. v. Dynascan Corp., 1988 WL 142216, *2 (N.D.Ill. Dec. 28, 1988) (excusing period of delay where plaintiff in patent infringement suit first "adjudicated another lawsuit that would establish a reasonable likelihood of success on the issue of infringement in the pending case"); Amicus, Inc. v. Post-Tension of Texas, Inc., 686 F.Supp. 583, 589 (S.D. Tex.

16

1987) (same), or address arbitration or settlement attempts, not forum-shopping in foreign jurisdictions, see Millennium Imp. Co. v. Sidney Frank Importing Co., 2004 USDistLexis 11871, *33-*34 (Jun. 11, 2004) (refusing to find that delay barred preliminary injunction of false advertising where parties had pursued alternative dispute resolution before the National Advertising Division of the Council of Better Business Bureaus prior to plaintiff filing suit); Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 129 F.Supp.2d 351 (D.N.J. 2000) (finding of irreparable harm in false advertising context not undermined by seven month-delay where plaintiff "notified J & J of its objections, promptly challenged the advertisements with the major networks, obtained the results of [a consumer survey]," and shortly thereafter initiated litigation); Tonka Corp. v. Rose Art Industries, Inc., 836 F.Supp. 200, 219 (D.N.J. 1983) (alleged delay did not support an acquiescence defense where plaintiff had filed an objection to defendant's trademark registration). The process of alternative dispute resolution of a false advertising claim is distinguishable from bringing litigation in a foreign jurisdiction. The parties could not have resolved, in Germany or Australia, a dispute regarding advertising within the United States. The cases that allow pursuit of remedies (through alternative dispute mechanisms) to constitute excusable delay do so because such mechanisms may have, with less expense and consumption of time, achieved a remedy substantially similar to that sought in court, an injunction. The same is not true of Schick's legal actions in foreign jurisdictions, which, even if successful, had no effect on Schick's legal rights in the United States.

Schick argues that the case law on delay is motivated by the need to notice

17

parties that a claim for false advertising may lie against them. This purpose, according to Schick, was served by the German litigation as well as non-judicial interactions between the parties prior to initiation of any litigation. However, Schick misunderstands the import of inexcusable delay in the context of an application for a preliminary injunction. As a factual matter, such delay suggests that irreparable harm does not exist as the moving party, for some significant period of time, declined to exercise rights that may have mitigated the irreparable harm it was suffering. The litigation in Germany and Australia had no legal effect on advertising in the United States and, for the purposes of the instant lawsuit, it is advertising in the United States that, according to Schick, is causing it to suffer irreparable harm.

The court concludes that the three months during which Schick pursued foreign litigation is not inexcusable. <u>See</u> <u>Tom Doherty, Inc.</u>, 60 F.3d at 39. Clearly Schick did not think Gillette's advertisements were not violating Schick's rights.

The court, therefore, considers Schick's delay in seeking relief alongside other evidence going to the factual question of irreparable injury. The court concludes that Schick's initiation of testing in May 2004 suggests that Schick believed it was being harmed from the day the M3 Power was launched. The severe decline in Quattro sales supports a finding of harm as does the fact that the parties are head-to-head competitors. Furthermore, the difficulty of determining what percentage of sales is attributable to Gillette's allegedly false advertising, and, therefore, the difficulty of accurately determining what monetary damages will compensate Schick for its harm, support a finding that any such harm is, indeed, irreparable.

**B.    False Advertising**

18

1. **Literal Falsity.** "Falsity may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertising is literally true, it is likely to deceive or confuse customers." Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir. 1997). "A plaintiff's burden in proving literal falsity thus varies depending on the nature of the challenged advertisement." Castrol, Inc., 977 F.2d at 63. The Second Circuit has found that where an advertisement alleges that tests have established a product's superiority, a plaintiff must demonstrate that the tests or studies did not prove such superiority. "[A] plaintiff can meet this burden by demonstrating that the tests were not sufficiently reliable to permit a conclusion that the product is superior." Id. In addition, "[i]f the plaintiff can show that the tests, even if reliable, do not establish the proposition asserted by the defendant, the plaintiff has obviously met its burden." Id.

Where, however, as here, the accused advertising does not allege that tests or clinical studies have proven a particular fact, the plaintiff's burden to come forward with affirmative evidence of falsity is qualitatively different. "To prove that an advertising claim is literally false, a plaintiff must do more than show that the tests supporting the challenged claim are unpersuasive." Mc-Neil-P.C.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544, 1549 (2d Cir. 1991). The plaintiff must prove falsity by a preponderance of the evidence, either using its own scientific testing or that of the defendant. If a plaintiff is to prevail by relying on the defendant's own studies, it cannot do so simply by criticizing the defendant's studies. It must prove either that "such tests 'are not sufficiently reliable to permit one to conclude with reasonable certainty that they established' the claim made" or that the defendant's studies establish that the

19

defendant's claims are false.  Id. at 1549-50.

The challenged advertising consists of two basic components: an animated representation of the effect of the M3 Power razor on hair and skin and a voice-over that describes that effect.  The animation, which lasts approximately 1.8 seconds, shows many hairs growing at a significant rate, many by as much as four times the original length.  During the animation, the voice-over states the following: "Turn it on and micropulses raise the hair so the blades can shave closer."  Schick asserts that this M3 Power advertising is false in three ways: first, it asserts the razor changes the angle of beard hairs; second, it portrays a false amount of extension; and third, it asserts that the razor raises or extends the beard hair.

With regard to the first claim of falsity, if the voiceover means that the razor changes the angle of hairs on the face, the claim is false.  Although Gillette removed the "angle changing" claim from its television advertisements, it is unclear whether it has completely removed all material asserting this angle-change claim.  The court concludes that the current advertising claim of "raising" hair does not unambiguously mean to changes angles.[8]  See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 298 F.3d 578, 587 (3d Cir. 2002) ("only an unambiguous message can be literally false").  Thus, the revised advertising is not literally false on this basis.

With regard to the second asserted basis of falsity, the animation, Gillette concedes that the animation exaggerates the effect that the razor's vibration has on

---

[8]It is the words "up and away" when combined with "raises" that suggest both extension and angle change.

hair.  Its own tests show hairs extending approximately 10% on average, when the
animation shows a significantly greater extension.  The animation is not even a
"reasonable approximation," which Gillette claims is the legal standard for non-falsity.
See Gillette's Prop. Conclusions of Law at ¶ 32, 37-38 [Dkt. No. 114].  Here, Schick can
point to Gillette's own studies to prove that the animation is false.  See Mc-Neil-P.C.C.,
Inc. , 938 F.2d at 1549.

Gillette argues that such exaggeration does not constitute falsity.  However, case
law in this circuit indicates that a defendant cannot argue that a television
advertisement is "approximately" correct or, alternatively, simply a representation in
order to excuse a television ad or segment thereof that is literally false.  S.C. Johnson &
Son, Inc., 241 F.3d at 239-40 (finding that depiction of leaking plastic bag was false
where rate at which bag leaked in advertisement was faster than rate tests indicated);
Coca-Cola Co., 690 F.2d at 318 (finding that advertisement that displaced fresh-
squeezed orange juice being poured into a Tropicana carton was false).  Indeed, "[the
Court of Appeals has] explicitly looked to the visual images in a commercial to assess
whether it is literally false."  S.C. Johnson, 241 F.3d at 238.[9]

Gillette's argument that the animated portion of its advertisement need not be
exact is wrong as a matter of law.  Clearly, a cartoon will not exactly depict a real-life
situation, here, e.g., the actual uneven surface of a hair or the details of a hair plug.
However, a party may not distort an inherent quality of its product in either graphics or

---

[9] At least one other circuit has held that picture depictions can constitute false
advertising.  Scotts Co. v. United Indus. Corp., 315 F.3d 264 (4th Cir. 2002) (finding that while
ambiguous graphic on packaging did not constitute literally false advertising, an unambiguous
graphic could do so).

animation.  Gillette acknowledges that the magnitude of beard hair extension in the animation is false.  The court finds, therefore, that any claims with respect to changes in angle and the animated portion of Gillette's current advertisement are literally false.

The court does not make such a finding with respect to Schick's third falsity ground, Gillette's hair extension theory generally.  Gillette claims that the razor's vibrations raise some hairs trapped under the skin to come out of the skin.  While its own studies are insufficient to establish the truth of this claim, the burden is on Schick to prove falsity.  Neither Schick's nor Gillette's testing can support a finding of falsity.

While there can be no finding of literal falsity with respect to Gillette's hair extension claim at this stage in the instant litigation, the court expresses doubt about that claim.  As described earlier, Gillette's own testing is suspect.  Furthermore, Schick introduced expert testimony and elicited evidence from Gillette's expert regarding the lack of scientific foundation for any biological mechanism that would explain the effect described by Gillette in its advertising.  Gillette's own expert, Dr. Philpott, testified that no scientific foundation exists to support Gillette's hypothesis that beard hairs might be trapped under the skin by sebum and corneocytes and that the application of mechanical energy might release such hairs.  While Dr. Philpott put forward another hypothesis--that a hair's curliness might cause it to be trapped--he also conceded that, prior to his engagement as an expert on Gillette's behalf, in twenty years of studying hair, he had never come across such a phenomenon.  The court credits the testimony of Schick's expert, Dr. Leffell, that while certain clinical conditions are characterized by hairs trapped under the surface of the skin, there is no such non-clinical phenomenon.

Nevertheless, putting forth credible evidence that there is no known biological

mechanism to support Gillette's contention that the M3Power raises hairs is insufficient to meet Schick's burden. Such evidence is not affirmative evidence of falsity. Further, while Schick successfully attacked Gillette's testing, that attack did not result in evidence of falsity. Unlike in McNeil, here Gillette's own tests do not prove hair extension does not occur. Schick merely proved that Gillette's testing is inadequate to prove it does occur.

      **2. Actual Deception.** Schick need not prove actual deception if Gilette's advertising is determined to be literally false. Mc-Neil-P.C.C., Inc., 938 F.2d at 1549 ("Where the advertising claim is shown to be literally false, the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public." (internal quotation marks and citations omitted)). Because the court finds that claims regarding angle change and the magnitude and frequency of hair extension portrayed in the animated portion of Gillette's television advertisement are both literally false, it presumes that these claims result in actual deception.

      **3. Materiality.** "It is also well-settled that, in addition to proving falsity, the plaintiff must also show that the defendants misrepresented an inherent quality or characteristic of the product. This requirement is essentially one of materiality, a term explicitly used in other circuits." S.C. Johnson & Son, Inc., 241 F.3d at 238 (internal quotation marks and citations omitted). In determining that certain allegedly false statements were not material, the Second Circuit considered the relevance of the statements and the fact that "[t]he inaccuracy in the statements would not influence customers." Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir. 1997).

It is clear that whether the M3 Power raises hairs is material.  Gillette's employees testified that television advertising time is too valuable to include things that are "unimportant".  Furthermore, in this case, hair extension is the "reason to believe" that the M3 Power is a worthwhile product.  The magnitude and frequency of that effect are also, therefore, material.  Whether a material element of a product's performance happens very often and how often that element happens are, in themselves, material.

**4.  Injury.**  The court finds that, in light of the advertisement's literal falsity, the fact that the parties are head-to-head competitors, and recent declines in the sale of Schick's premiere wet shave system injury will be presumed.  <u>Coca-Cola Co.</u>, 690 F.2d at 316-317.  While Schick has not submitted consumer surveys or market research, the fact that the parties are head-to-head competitors supports an inference of causation.

**5.  Interstate Commerce.**  The parties do not dispute that this element of the claim has been established.

Accordingly, the court finds that Schick has established a likelihood of success on the merits of its claims insofar as Gillette's claims regarding changes in hair angle and its animation depicting an exaggerated amount of hair extension are literally false.  The court finds that Schick has failed to establish a likelihood of success, or even serious questions going to the merits, on the claim of hair "extension."

**BOND**

Gillette has requested a bond of $49,579,248.  It contends that this amount represents estimated lost profits on future M3 Power sales, over a twelve-month period, if later found to have been wrongfully enjoined.  Schick submits that a bond of $50,000

24

to $100,000 is appropriate.

Gillette's calculations assume a precipitous drop in sales as a result of a mandate to correct two admitted falsities in its advertisement.[10]  The court is skeptical that this calculation represents an appropriate bond amount.[11]  Instead, the court imposes a bond of $200,000 on Schick.  Absent a record created by Gillette, the court concludes this amount, generally in the range for false advertising cases, is sufficient to protect Gillette.  Gillette may move to increase the bond amount upon a showing of likely injury.

**CONCLUSION**

For the reasons stated above the Motion for Preliminary Injunction [Dkt. No. 7] is GRANTED in part and DENIED in part.  The injunction is entered as stated in the accompanying order.  Schick's Motion for Leave to Amend [Dkt. No. 103] is GRANTED.

**SO ORDERED**

Dated at Bridgeport, Connecticut this 31st day of May, 2005.


/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge

---

[10]While Gillette contends that the animated portion of its advertisement is not literally false as a matter of law, it has conceded that, as a factual matter, the animation represents an exaggerated hair-extension effect.

[11]Does it claim that it cannot sell one M3 Power razor without making false claims regarding angle change or the magnitude of hair extension?  When it ceased television and print advertising with the "angle change," did its sales drop precipitously?

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SCHICK MANUFACTURING, INC.,    :
ET AL    :
     Plaintiffs    :
         :    CIVIL ACTION NO.
v.    :    3-05-cv-174 (JCH)
         :
THE GILLETTE COMPANY    :    MAY 31, 2005
     Defendant    :

**PRELIMINARY INJUNCTION ORDER**

For the reasons set forth in this court's opinion dated May 31, 2005, which grants

in part the motion of plaintiffs Schick Manufacturing, Inc., Eveready Battery Company,

Inc., and Energizer Battery, Inc. for preliminary injunction, it is hereby ORDERED, that

pending final judgment in this action, The Gillette Company, its officers, agents,

servants, employees, representatives, subsidiaries, and affiliates are enjoined from

stating or communicating, directly or indirectly, by words or visual images, in any

advertising packaging, promotional materials or promotional activities that:

    (1)    the M3 Power razor or its micro-pulses or oscillations change the angle of

           hair in relation to the skin; or

    (2)    the M3 Power razor or its micro-pulses or oscillations extend or lengthen

           hair by a magnitude or with a frequency that is not literally or

           physiologically accurate; and

IT IS FURTHER ORDERED, that within 30 days of entry of this ORDER, The

Gillette Company, its officers, agents, servants, employees, representatives,

subsidiaries, and affiliates:

1